UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

THE LOUISVILLE KENNEL CLUB, INC., ET AL.                    PLAINTIFF

v.                                        CIVIL ACTION NO. 3:07-CV-230-S

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT           DEFENDANTS


## MEMORANDUM OPINION

This matter is before the Court on cross-motions for summary judgment.  Plaintiffs (several

pet-owners' groups, pet-related businesses, veterinarians, and individual pet owners) seek to

overturn an amendment[1] to Chapter 91 of the Louisville/Jefferson County Metro Government Code

of Ordinances on numerous grounds. They argue that various sections of the amended Code violate

the federal Constitution and Kentucky law.  Because of the pervasiveness of the alleged defects,

Plaintiffs seek declaratory and injunctive relief voiding the ordinance *in toto*. Defendant, the

Louisville/Jefferson County Metro Government ("Metro"), of course, disputes these allegations.

The parties (and the Court) agree that the case is ripe for summary judgment. There are no

disputed facts; the only question is which side is entitled to judgment as a matter of law.  *See* Fed.

R. Civ. P. 56(c).

Plaintiffs' objections to the ordinance in question may be grouped under five headings.  First,

plaintiffs argue that several sections of the ordinance are unconstitutionally vague. Others, they say,

lack a rational relationship to a legitimate legislative purpose and therefore violate the Equal

Protection Clause and the "substantive" component of the Due Process Clause. One provision

---

[1] Ordinance No. 290, Series 2007, "An Ordinance Amending Chapter 91 of the Louisville/Jefferson County Metro Government Code of Ordinances ("Code") Pertaining to Unaltered Dogs, the Waiver of Metro Animal Service Fees Due to Financial Hardship, and the Quarantine of Animals (Amended by Substitution)." The Court will refer to this legislation as "the ordinance."

allegedly requires forfeiture of certain pets without adequate "procedural" Due Process. A fourth

set of provisions, it is argued, authorize illegal warrantless searches and seizures of pet owners'

homes and property. Finally, plaintiffs argue that various sections of this local ordinance stand in

conflict with state law. The Court will address plaintiffs' arguments in turn.

## I. Vagueness

### A. Legal Standard

The "vagueness" doctrine stems from the Due Process Clauses of the Fifth and (here)

Fourteenth Amendments. A vague law offends constitutional norms in that it fails both "(1) to

define the offense with sufficient definiteness that ordinary people can understand prohibited

conduct, and (2) to establish standards to permit police to enforce the law in a non-arbitrary,

non-discriminatory manner." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556

(6th Cir. 1999) (*citing Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). These standards are not to

be "mechanistically applied," *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498

(1982), and the Sixth Circuit has concluded that it is the "second prong—providing minimal

guidelines to govern the conduct of law enforcement—[that] constitutes the more important aspect

of the vagueness doctrine. *Belle Maer Harbor*, 170 F.3d at 556-57 (*citing Smith v. Goguen*, 415

U.S. 566 (1974)).

The rejection of "mechanistic" application of the terms of the vagueness standard means that

"[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair

notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates*, 455

U.S. at 498. A criminal statute or one that threatens constitutionally protected rights (particularly

the First Amendment right to freedom of speech) is subject to more stringent review than an

economic regulation or an enactment enforced only by civil sanctions. Specifically, "an enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Belle Maer Harbor*, 170 F.3d at 557 (*citing Hoffman Estates*, 455 U.S. at 494). The ordinance at issue imposes both civil and criminal penalties;[2] a higher degree of clarity is therefore required  if it is to be upheld.

Counterbalancing this demand for heightened clarity is the fact that the plaintiffs have raised a facial vagueness challenge to the ordinance.  They have alleged no facts regarding the ordinance's enforcement; none of the plaintiffs has a specific "dog in this fight." Moreover, the ordinance does not reach constitutionally protected conduct such as speech. Consequently, to show that a section of the ordinance is unconstitutional, they "must demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## B. Application

Plaintiffs allege that the following provisions of the ordinance are unconstitutionally vague: its definitions of "dangerous dog" and "potentially dangerous dog," and the exemptions from these definitions; its requirement of "proper" enclosures for unaltered dogs (that is, dogs that have not been spayed or neutered); its definitions of "nuisance," "attack," "restraint," and "cruelty"; its impoundment provision; and its tethering requirements.

---

[2] *See* Louisville/Jefferson County Code of Ordinances § 91.999 (2007).

### 1. "Dangerous" and "Potentially Dangerous" Dogs

**(a)**     Section 91.001 of the ordinance defines as "dangerous" any dog that, *inter alia*, "maims or kills domestic pets or livestock when not under restraint."[3] Plaintiffs argue that "[a]ny dog will 'maim or kill' any number of [domestic pets]—rabbit, mouse, rat, etc.—if presented with the opportunity." (Pl.'s Br. 20.) Consequently, they argue, every dog in the city falls under the statutory definition of "dangerous." On their view this is problematic because the ordinance's breadth necessarily gives enforcement officers undue discretion in how it is enforced.

As noted above, however, the plaintiffs have the burden of showing that there is no case in which the application of the ordinance is clear. There are some animals that plainly fall within the statutory definition—one might think of an aggressive wolf-dog hybrid. Others—a lame, aging, well-trained lapdog, perhaps—obviously lack the propensity (or physical capacity) to chase and kill small pets. Moreover, the wording of the ordinance (active, present-tense verbs) indicate that a past history of attacking pets or livestock, or a known propensity to do so, is required for a finding of dangerousness. Because there are at least some applications of the ordinance that are clear, plaintiffs' facial challenge to the ordinance's "maim or kill" definition fails.

**(b)**     The ordinance alternatively defines "dangerous dog" as "[a]ny dog which is declared by the Director [of Metro Animal Services] to be a dangerous dog under the procedures set forth in this chapter."[4] Plaintiffs place significant emphasis on their assertion that the referenced sections do not further define "dangerous dog." In their view this renders the definition hopelessly circular, leaving it completely up to the unfettered discretion of a government agent.  In support, they cite a

---

[3] A dog otherwise fitting this definition is considered "potentially dangerous" while it is properly restrained.

[4] An analogous definition applies to "potentially dangerous dogs."

-4-

superficially similar case, *Folkers v. City of Waterloo*, 2007 U.S. Dist. LEXIS 76101 (D. Iowa 2007). In *Folkers*, the statute in question defined "dangerous dog" as "[a]ny dog declared to be dangerous by the city council or an animal control officer." *Id.* at 28. The magistrate judge held (and the district judge adopted his reasoning) that "this circular definition does not provide any guidance to the public and is unconstitutionally vague." *Id.* at 29. The apparent similarity of that ordinance to the one *sub judice* suggests to the plaintiffs that this Court should follow suit.

However, a careful reading of the ordinance rids us of this vagueness problem. The definition in question refers the reader to "the procedures set forth in this chapter," which are contained in § 91.151, and specifically in two subsections, (C) and (D). The first instructs the Director to determine whether a dog found "at risk"[5] is "dangerous" or "potentially dangerous," "as defined in this chapter."  Returning to the definitions section of the ordinance, one finds four definitions of "dangerous dog" and two definitions of "potentially dangerous dog" that the Director might use in determining whether a given animal is legally dangerous. This is not an endless circle between two code sections, or the kind of limitless grant of discretion to an animal control officer that the court confronted in *Folkers*.

Further, § 91.151(D) provides a definition of "dangerous dog" not seen in § 91.001: "If an at-risk dog under investigation has previously been classified as a potentially dangerous dog and exhibits escalating aggressive behaviors which threaten public safety or welfare, that circumstance alone may be grounds for . . . the Director to determine that the dog is a dangerous dog." This procedure for declaring a dog "dangerous" gives specific external content to § 91.001's reference to "procedures set forth in this chapter."

---

[5] I.e. one found off of its owner's premises threatening or harming a person or animal, or walking free without restraint.

It may be argued that the definitions in question are inordinately convoluted, or poorly drafted, but they do not constitute the sort of unbounded discretion that should be declared unconstitutionally vague on its face. Accordingly the Court will grant summary judgment for the defendants as to these sections of the ordinance.

(**c**)    Plaintiffs further ask the Court to void certain exemptions from the definitions of "dangerous" and "potentially dangerous" dogs, as set forth in § 91.150(B). Subsection (B)(1) states that an animal is not to be deemed (potentially) dangerous solely because it bites "[a]nyone assaulting its owner," but not including a police officer attempting to subdue a suspect. Subsection (B)(4) exempts a dog from classification as dangerous if it attacks a person committing criminal trespass, but not if that person had committed merely a simple trespass.

Plaintiffs are surely correct to claim that these sections put impossible burdens on the cognitive ability of dogs. A dog in all likelihood cannot distinguish a police officer from anyone else subduing its owner; nor can it perceive the mental state of an individual entering onto its territory.

But that does not mean the law is vague. Plaintiffs claim that these exemptions set forth "incomprehensible standards," such that neither citizens nor enforcement officers can understand their meaning sufficiently well to act in accordance with the law. (Pl.'s Br. 22.) This claim is simply in error. The question is whether the law is vague, and it is not. A dog may be deemed "dangerous" if it attacks a police officer or a non-criminal trespasser. An owner may avoid a declaration of dangerousness by restraining his dog unless and until he knows that a trespasser is a criminal or that an assailant is not a policeman. This may have the effects of limiting some lawful activity (i.e. the use of dogs for protection), and of offering some security to criminals who might otherwise expect

to be attacked more often by dogs. That policy choice, however, is for the Metro Council to make. It has not done so in an unconstitutional manner.

**2.      The Enclosure Requirement**

Plaintiffs next argue that § 91.022(A) is vague.  That section provides that unaltered dogs are to  be maintained "[i]n a proper enclosure as defined in this chapter; and as approved by the Director in writing." Plaintiffs first contend that "because the Director cannot possibly enforce the provision against everyone to whom it applies, he must enforce it selectively." (Pl.'s Br. 26.) The same could be said for speed limits, jaywalking laws, and the prohibition on underage drinking. There are far too many laws in 21st-century America for law enforcement to enforce every one of them every time it is broken. Certainly this state of affairs does not render every law and regulation that is not scrupulously enforced unconstitutionally vague.

Plaintiffs further claim that this enclosure requirement is illegally vague because it does not define what it means for an enclosure to be "proper."  "Enclosure" itself is defined by § 91.001 of the ordinance as "a fence or structure of sufficient height and construction to prevent the animal from leaving the owner's property," and to include (with certain exclusions) electric fences. True, it does not define "proper," but the Court reads this adjective as a modifier, not as a word creating an entirely new term.  The Oxford English Dictionary defines "proper" as "[s]uitable for a specified or implicit purpose or requirement; appropriate to the circumstances or conditions; of the requisite standard or type." Thus "proper enclosure as defined in this chapter" simply means an enclosure meeting the specifications outlined in § 91.001. This section is not vague.

**3.      "Nuisance"**

Plaintiffs next argue that the ordinance is unconstitutionally vague in its definition of "nuisance." That definition (again, part of § 91.001) begins as follows:

> Any act of an animal or its owner that irritates, perturbs or damages rights and privileges common to the public or enjoyment of private property or indirectly injures or threatens the safety of a member of the general public.

True, the bare words of the first paragraph of the definition bear some resemblance to a statute criminalizing assembly on the sidewalk "in a manner annoying to persons passing by." *Coates v. Cincinnati*, 402 U.S. 611, 611 & n.1 (1971). The *Coates* Court declared that ordinance unconstitutionally vague, *id.* at 614,[6] but the enactment at bar differs from the Cincinnati law in a crucial respect: It contains a long list of forms of conduct that are, *ipso facto*, nuisances. These include allowing an animal to make so much noise as to "result in a serious annoyance or interference with the reasonable use and enjoyment of neighboring premises"; permitting an animal to damage another's property; allowing an animal to chase or attack passers-by, vehicles, or other animals, and so forth.[7]

---

[6] The Court also found that it violated the constitutional rights of free assembly and association, 402 U.S. at 615, but those rights are not at issue here.

[7] The complete enumeration is as follows:

(a) Allowing or permitting an animal to habitually bark, whine, howl, mew, crow or cackle in an excessive or continual fashion or make other noise in such a manner so as to result in a serious annoyance or interference with the reasonable use and enjoyment of neighboring premises.

(b) Allowing or permitting an animal to damage the property of any person other than its owner or caretaker, including but not limited to getting into or turning garbage containers or damaging gardens, flowers, plants or other real or personal property or leaving fecal material on the property of another person.

(c) Allowing or permitting an animal to molest, chase, snap at, attack or attempt to attack passers-by, vehicles, domestic pets or livestock.

(d) Allowing or permitting an animal to habitually or continually roam or be found on property of other than its owners or caretakers, trespassing school grounds, parks or the property of any person.

(continued...)

-8-

"Where a statute lists specific things followed by a more general one, the canon of *ejusdem generis* provides guidance." *United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008). This canon serves just as well when the specific items follow the general one.  It instructs us to "attribute 'the same characteristic of discreteness shared by all the [following] items' to the term in question." *Id.* (*quoting Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004)); *see also Canton Police Benevolent Ass'n of Canton v. United States*, 844 F.2d 1231, 1236 (6th Cir. 1988) (under the "time-honored rule of *ejusdem generis*, . . . a general word in a statute takes its character from the specific words with which it appears").

Applying *ejusdem generis* to the ordinance at hand, the broad terms of the preamble paragraph are significantly narrowed.  A "nuisance" is not just *any* act that irritates or perturbs another. Rather, it is an act having the same general characteristics as the acts enumerated in the rest of the section: allowing an animal to threaten or injure another's person or property, or his enjoyment thereof.  The ordinance's definition of "nuisance" is sufficiently clear that it cannot be held unconstitutionally vague on its face.

4.      "Attack"

---

[7](...continued)
(e) Allowing or permitting an animal to be housed or restrained at a distance, that, in the discretion of the animal control officer, poses a threat to the general safety, health and welfare of the general public.

(f) Allowing or permitting an animal to be maintained in an unsanitary condition.

(g) Allowing or permitting an animal to habitually charge in an aggressive manner a fence separating from another property when the usual residents are taking pleasure in such property without provoking such animal.

The ordinance (again, in § 91.001) defines "attack" (circularly) as "[a]n unprovoked attack in an aggressive manner on a human that causes a scratch, abrasion, or bruising, or on a domestic pet or livestock that causes death or injury." Plaintiffs claim this is unconstitutionally vague for two reasons.

First, they argue that "it sweeps into its limitless reach all dogs that would cause 'injury' to a 'domestic pet.'" (Pl.'s Br. 36.) This, they say, "results in a definition that effectively includes every dog in Louisville." (*Id.*) Plaintiffs' suggestion is that because a dog can be declared (potentially) dangerous if it has attacked another animal, and because any dog is likely to attack a rat or guinea pig given the opportunity, the ordinance treats an irrationally large number of dogs as "dangerous." This argument would bear some weight if a dog could be seized and declared dangerous because of the hypothetical possibility that it *might* commit an attack, but those consequences follow only on the occasion of an *actual* attack.[8] There is nothing vague about the ordinance's definition of "attack" once we get past its circularity.[9]

Second, plaintiffs claim that the definition applied to human victims is vague. Any dog in Louisville, they say, could legally "attack" someone by causing a scratch or bruise in some "harmless situation[]." This argument ignores the first half of the sentence defining the word in question: "An *unprovoked* attack *in an aggressive manner* . . . ." (emphasis added). Plaintiffs fail to suggest even a hypothetical situation in which a dog could, without provocation, harmlessly (but in an aggressive manner) assault a human being and thereby cause a scratch, abrasion, or bruising. Even if they had done so (the Court does not see how they could), the nature of their facial challenge

---

[8] *See* Louisville/Jefferson County Metro Government Code of Ordinances § 91.150(A).

[9] Say, by substituting a common English understanding of the word "attack" into the statutory definition.

-10-

would require that the definition be impermissibly vague in all applications, which it plainly is not. The definition of "attack" is constitutionally sound on its face.

5.      **"Restraint"**

Plaintiffs next challenge the ordinance's requirement that puppies and dogs, when off the premises of the owner and without permission otherwise, "must be restrained by a lead or leash and under the control of a responsible person physically able to control the dog." This is unconstitutional, they say, because it "provides no meaningful guidance" to citizens and animal control officers in determining whether a given person is capable of restraining a given dog. (Pl.'s Br. 37.) Again, this argument cannot prevail in the setting of a facial challenge to the ordinance. There are innumerable cases in which the answer to the question "Can this person control that dog?" is patently obvious. Most anyone with the aid of a leash can successfully keep a handle on a Yorkshire terrier. Comparatively few people possess the physical strength to control a mastiff or other large breed. Because there are cases where the application of the ordinance is clear, this facial vagueness challenge fails.

6.      **The Impoundment Provision**

Plaintiffs' next assertion is that § 91.070(E) is unconstitutionally vague because it contains "an unrestricted delegation of power which leaves the definition of its terms to [the Director]." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608-09 (6th Cir. 2005). The section in question provides that certain animals, once impounded, "shall not be released, except upon terms and conditions imposed by the Director that are in the interest of public safety and welfare." On the plaintiffs' view, this directive provides too little guidance to the officials implementing it.

-11-

This argument is misplaced.  The void-for-vagueness doctrine applies to laws that are prohibitive in nature. The purpose of the vagueness rule is to ensure that citizens know what conduct is permitted and what is proscribed, and to prevent arbitrary enforcement by law enforcement officials against conduct not clearly covered by the law.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Belle Maer Harbor*, 170 F.3d at 556. Consequently it has no application to § 91.070(E), which is not prohibitive in nature but rather instructs the Director on how to handle certain classes of impounded animals. This section of the ordinance does not leave citizens without guidance as to what conduct is permitted and what is not, because in any individual case the Director will have imposed specific conditions interpreting "the interest of public safety and welfare." Were the Director to impose restrictions that were themselves vague, they could be challenged as applied (because they would impose a standard of conduct for individual citizens). Such conditions are not before the Court, and the vagueness doctrine therefore has no application here.

**7.     Tethering Standards**

Plaintiffs argue that the ordinance's tethering standards (§ 91.091(A)) are vague. Their arguments are without merit. The ordinance's plain language, though perhaps not a model of precision, is sufficiently clear to give dog owners notice of what is required of them. Subsection (A)(1)(a) prohibits use of a fixed-point tether between 8 a.m. and 6 p.m. Subsection (A)(1)(b) further prohibits use of a fixed-point tether for more than one hour in any eight-hour period. True, there is no conjunction between the two subsections—an "or" is probably warranted—but they can both be given effect without conflict: A fixed-point tether may not be used at all within the specified times, and outside of those hours it use is limited to one hour in eight.

The remainder of the section is no less clear. Subsections (A)(1) and (A)(2) cover distinct methods of restraint. Part (1) refers only to "fixed-point" tethers, which the Court reads to mean a tether attached to a single stationary point (e.g. a stake or tree) in an owner's yard. Part (2) describes a more complex system: a tether attached to a trolley, allowing for a greater range of movement than a fixed-point tether. Because the time restrictions described above appear only in subsection (1), they do not apply to subsection (2). A trolley-tether system may be used at any time, without restrictions. The tethering standards are sufficiently clear to avoid a facial challenge to their validity.

**8.    Revocation of License**

Plaintiffs contend that § 91.024(B) is impermissibly vague. It provides that the Director may revoke or deny any pet license, providing the following guidance: "Grounds for such revocation or denial include, but are not limited to, conviction pursuant to any violation of this chapter or conviction pursuant to any related state or federal law." This section is more problematic than those discussed above, because it appears to allow the Director to impose a civil punishment for any reason at all, leaving citizens unaware of what actions might constitute grounds for license revocation. *Ejusdem generis* does not help, because the terms of subsection (B) negate the premise of that canon: Grounds for revocation "are not limited" to violations of the ordinance or related law. Thus the text would apparently allow imposition of punishment for violations of *unrelated* law, or for any reason the Director might come up with. And while the ordinance provides for appeals to the Secretary of the Cabinet of Public Works and Services, it offers no standard of review or basis for deciding the appeal in a case where the grounds for revocation are questionable.

Despite some misgivings about § 91.024(B), however, the Court cannot hold it facially void. After all, it does include at least one category of cases, convictions pursuant to violations of Chapter

91, in which there are clearly grounds for revocation. Moreover, the specific terms of the ordinance provide at least some guidance as to what sorts of behavior ought to constitute grounds for revocation. To hold an ordinance invalid on its face, a court must find that it is impermissibly vague in *all* of its applications. *Hoffman Estates*, 455 U.S. at 497. Because we cannot do so, this challenge must fail.

**9.      "Cruelty"**

Plaintiffs' final vagueness challenge is to the ordinance's definition of "cruelty" (§ 91.001) and its requirement that pet owners and kennels provide animals with certain necessities (§§ 91.090, 91.120, 91.121, 91.122). In support, however, plaintiffs can muster only a conclusory assertion that the standards in question provide "no level of definiteness," and an unsubstantiated fear that the word "wholesome" will be nefariously interpreted. (Pl.'s Br. 42-43.) We need not pause long over these arguments; the challenged language speaks for itself. Plaintiffs cannot show that the ordinance is vague in all its applications, and they therefore cannot prevail.

## II. Equal Protection and Substantive Due Process

### A. Legal Standard

Plaintiffs claim that parts of the ordinance violate citizens' rights under the Fourteenth Amendment's Equal Protection and Due Process Clauses. As plaintiffs recognize, this case involves neither discrimination against a suspect class nor the violation of fundamental rights. Consequently under either clause, the Court's analysis falls under the rubric of "rational basis" review. *See Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 505 (6th Cir. 2007) (equal protection); *Berger v. City of Mayfield Heights*, 154 F.3d 621, 624 (6th Cir. 1998) (due process). The essence of the analysis

is the question whether a "rational relationship exists between the terms of the ordinance and a legitimate governmental purpose." *Berger*, 154 F.3d at 624.

## B. Application

### 1.   Approval of Enclosures in Writing

Plaintiffs argue that § 91.022(A)(1) fails rational basis review insofar as it treats owners of unaltered dogs differently from owners of altered dogs. That section requires that enclosures for unaltered dogs be approved by the Director in writing. Elsewhere (§§ 91.001 and 91.002), the ordinance requires that all dogs be kept under restraint, defined so as to mirror the requirements of §91.022(A)(1) with the exception of the written approval requirement. Thus it is the approval requirement that the Court must consider.

It is unclear whether defense counsel recognized the issue the plaintiffs sought to raise, as the defendant's brief asserts that "there is no possible application of this Section to any dog owner above or beyond the restraint provisions elsewhere in the ordinance." (Resp. 10.) Further, Metro concedes that the provision "is clearly a redundant nullity." (*Id.* at 11.) Having renounced the value of this section, defendant also makes no effort to justify it with any government interest. Indeed, as defendant notes, the remainder of the ordinance has been amended to remove additional requirements that had been placed on owners of unaltered dogs. This suggests that the persistence of additional requirements in §91.022(A)(1) is indeed a "legislative oversight" with no evident purpose, as the defense speculates. (*Id.* at 10.) The Court will take the defense at its word. There being no apparent reason why the owners of unaltered dogs should be treated differently than the owners of their neutered counterparts, the written approval requirement lacks a rational basis and is unconstitutional.

-15-

2.      **Sale of Animals**

Section 91.027(D) of the ordinance reads as follows:

It shall be unlawful for any person to sell, offer to sell, or to advertise the sale of an animal, or for any person to purchase a dog which has been classified by the Director as a dangerous dog or a potentially dangerous dog without the written permission of the Director.

Plaintiffs argue that this section is so irrational as to violate due process. They are surely correct that it is poorly drafted. The plain terms of the first clause appear to prohibit the sale of any animal anywhere in Louisville, while the plain terms of the second clause allow for the sale of (potentially) dangerous dogs with permission of the Director.

However, the Court declines to read the ordinance so literally as to rob it of rationality. The title of § 91.027 is "*Certain* Sales of Animals Prohibited" (emphasis added), which implies that not all such sales are illegal. Moreover, as plaintiffs point out, other subsections of § 91.027 contemplate the sale of animals under certain conditions. Bearing this in mind, it is better to read subsection (D) as Metro suggests (Resp. 14): It requires written permission from the Director for the sale or purchase of any animal that has been declared a dangerous dog or a potentially dangerous dog, without otherwise restricting the sale of animals. Given this construction, there is nothing constitutionally suspect about §91.027(D).

### III. Procedural Due Process

Plaintiffs claim that § 91.101 of the ordinance threatens a citizen's right to a fair hearing before being deprived of property. Before delving into the governing jurisprudence, we think it wise to determine how the ordinance operates.

As with other sections of the ordinance in question, § 91.101 seems to be the victim of hasty drafting. Entitled "Confiscation of Victimized Animal," its purpose is to allow the authorities to take

-16-

possession of an animal that has been the victim of any of several forms of inhumane treatment. These include (*inter alia*) failure to provide necessities, abandonment, mutilation, and "exhibition fighting." Section 91.101(A) provides that an animal found involved in a violation of any of these prohibitions may be confiscated by an animal control officer, evidently for its protection.

Once an animal has been confiscated, subsection (B) provides for a hearing before a judge. That judge is to determine whether probable cause existed for the confiscation. If so, the owner must post a $450 bond within 24 hours to cover the cost of 30 days' boarding and veterinary care for the animal, which remains in the city's possession. A new bond must be posted every 30 days, and failure to do so results in immediate forfeiture of the animal. The ordinance does not say what happens if no probable cause is found, but the implication of the bond and forfeiture provisions, coupled with general background notions of justice, must be that absent probable cause the animal is to be returned to its owner.

Section 91.101(B)(1) goes on to provide that upon a plea or finding of guilt, the animal's owner becomes responsible for all costs created by the impoundment. (That is, any bond he has posted is not returned, and he must pay any outstanding amount due.) Further, the animal in question becomes property of the city. If the accused is found innocent, subsection (B)(2) provides that any posted bond is to be returned to the owner. The ordinance does not explicitly provide for return of a seized animal if its owner is found to be innocent. Again, however, context leads the Court to conclude that returning the animal on a finding of innocence must have been the Metro Council's intent. There is, first, the obvious fact that this is the just result of such an adjudication. In addition, it makes little sense for the government to return the posted bond—leaving it on the hook for all the animal's expenses up to the acquittal—and then to hold onto the animal at its own further expense.

-17-

Finally, the last sentence of subsection (B)(1) states: "Upon conviction, all animals not forfeited pursuant to subsection (B) herein above shall become the property of the Metro Government." This implies that, prior to conviction, ownership of the animal does not change. After an acquittal, then, the original owner retains his rights, and the city has no further basis for holding the animal.

The construction offered above solves two problems with § 91.101, allowing for the return of a confiscated animal upon a finding of either no probable cause or innocence (if the bond has been duly paid). But a third problem lingers. It is undoubtedly the case that the ordinance mandates permanent forfeiture of a seized animal if the judge finds probable cause and the owner fails to timely post the appropriate bond. This provision is evidently meant to ensure that the owner of a confiscated dog has an interest in posting the bond: If he could refuse to do so and then wait for an adjudication of guilt, he might never have to post before getting the dog back (if he is found innocent), or he might lose his ownership of the dog (if he is found guilty) and thus any incentive to pay the past-due boarding and veterinary costs. The result is that a person whose dog has been confiscated, and against whom there is probable cause that he violated one of the humane treatment requirements, will lose his dog permanently unless he posts bond, even if he is ultimately found innocent of the underlying charge. This possibility presents a legitimate due process claim.

Claims under the "procedural" arm of the Due Process Clause are governed by the balancing framework set up by *Mathews v. Eldridge*, 424 U.S. 319 (1976). Determining how much process is due in a given case involves consideration of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards";

and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

As plaintiffs argue, pet owners clearly have a property interest in their animals. *See Bess v. Bracken County Fiscal Court*, 210 S.W.3d 177, 180 (Ky. 2006) (recognizing that dogs are personal property). This interest is not absolute and is subject to regulation by state and municipal governments. *Id.* Nonetheless, the government is not permitted to deprive an animal owner of his property without due process of law. The question is not whether process is due, but rather how much is required.

We therefore inquire into the second prong of the *Mathews* test. As the procedure stands, the risk of erroneous deprivation of this property interest is significant. It is perfectly possible for a judge to find probable cause that a person has committed an offense, but for that person later to be found innocent. Under the scheme set up in § 91.101, if such a person was unable to put up $450 immediately upon the probable cause finding, his pet is forfeit and he has no apparent recourse for its recovery, even if he is ultimately found innocent of the underlying charge. There is thus a high risk of erroneous deprivation, which some sort of additional hearing, appeal, or late-payment process could remedy. Moreover, the government has little interest in keeping ownership of pets belonging to innocent citizens. Presumably most of the animals kept under this ordinance have to be euthanized, lest the burden of boarding and caring for them grow too high. The government does not articulate any interest whatsoever in its brief—it does not even cite *Mathews*—and the Court is unwilling to fabricate one. Consequently we must hold that the portion of § 91.101 that would permanently deprive a pet owner of his property, absent a finding of guilt, is unconstitutional.

It seems likely that § 91.101 is poorly drafted and does not properly represent the intent of its authors. However, this Court is not in the business of authoring or revising legislation. As a remedy for the constitutional failing just described, the Court will therefore enter an injunction against enforcement of the ordinance in the manner just described. Applications of § 91.101 that do not infringe the constitutional right to due process of law may continue.

### IV. Fourth Amendment

Plaintiffs argue that four sections of the ordinance violate the Fourth Amendment by authorizing warrantless searches and/or seizures.

We reject out of hand the suggestion that § 91.022 is unconstitutional. Plaintiffs urge that it is invalid to the extent that it is interpreted to authorize warrantless searches. Its plain terms do no such thing. They merely require that unaltered dogs be kept either in an enclosure or under restraint. Nor has there been any authoritative interpretation of the section that would empower law enforcement officers to act in a manner contrary to the Constitution. Plaintiffs rely on the deposition testimony of the current Director, Dr. Gilles Meloche, to the effect that the adequacy of an enclosure is determined on a case-by-case basis. They seem to think this implies warrantless searches of property under the guise of "inspections." But nowhere in Dr. Meloche's testimony, which has no legally binding effect on pet owners, does he claim the right to search a home without permission or warrant. On this point the plaintiffs are doing battle with a bogeyman of their own conjuring.

Three other sections appear more troubling. Each expressly authorizes seizure of a dog found in violation or suspected violation of the ordinance, without requiring a warrant. Section 91.073(D) provides:

> Where an Animal Control Officer observes a dog being kept on a chain or tether, in
> potential violation of the restraint definition in this chapter, the officer may notify the

owner of the violation in person or by means of a notice placed at the entry to the property. If the owner does not correct the situation or notify MAS within one hour of the placement of such notice that the dog has been removed from the chain or tether, the dog may be removed and the owner issued a violation notice or uniform citation for violation of the restraint requirement.

Similarly, § 91.094(A) provides, in pertinent part:

In the event there is a reasonable cause to suspect that an animal is being beaten, cruelly ill-treated, neglected or tormented or involved in a dogfight, cockfight or other combat, custody of such animal may be taken by an Animal Control Officer or peace officer and impounded in the animal shelter. The animal shall be held as evidence and confined in such facility in a humane manner.

Finally, § 91.101(A) states that "Any animal found involved in a violation of any portion of this section may be confiscated by any Animal Control Officer or any peace officer and held in a humane manner."[10] These provisions appear to contemplate the seizure and removal of animals from their owners without need for a warrant.

Notwithstanding the language of the ordinance, Metro vehemently disclaims the idea that it authorizes warrantless seizures. The Fourth Amendment, Metro acknowledges, acts as an independent check on animal control officers, who evidently know of the warrant requirement and its myriad exceptions and who are scrupulous in their observance of constitutional dictates. This is, of course, a wise position to take; to the extent that an ordinance authorizes searches or seizures of a sort not sanctioned by the Constitution, it must be unconstitutional. That is merely to state a truism, but as the Court has in essence been asked only to affirm that the Fourth Amendment applies to searches contemplated by the above-quoted sections, there is little else to say.

The parties and the Court are in agreement on this issue. Consequently, we are not presented with a "Case" or "Controversy" as Article III requires for the exercise of federal judicial power.

---

[10] "Section" in this context evidently refers to the collection of provisions gathered under the heading "Humane Treatment of Animals."

Plaintiffs' Fourth Amendment challenges therefore must be dismissed for lack of subject-matter jurisdiction.

### V. Conflicts with Kentucky Law

Plaintiffs contend that various sections of the ordinance conflict with Kentucky law and are therefore illegal. State law provides:

> Urban-county governments may enact and enforce within their territorial limits such tax, licensing, police, sanitary and other ordinances not in conflict with the Constitution and general statutes of this state now or hereafter enacted, as they shall deem requisite for the health, education, safety, welfare and convenience of the inhabitants of the county and for the effective administration of the urban-county government.

Ky. Rev. Stat. § 67A.070(1)[11] It goes on to provide that "ordinances shall be deemed to conflict with general statutes of this state . . . [w]hen the ordinance authorizes that which is expressly prohibited by a general statute; or . . . [w]hen there is a comprehensive scheme of legislation on the same subject embodied in a general statute." Ky. Rev. Stat. § 67A.070(2). There is no allegation that any of the challenged sections are expressly prohibited by state law. The question is whether any of them has been preempted by a comprehensive scheme occupying the field they seek to regulate.

The Kentucky Supreme Court has ruled that:

> The mere presence of the state in a particular area of the law or regulation will not automatically eliminate local authority to enact appropriate regulations. Local regulation is not always precluded simply because the legislature has taken some action in regard to the same subject. . . . The true test of the concurrent authority of the state and local government to regulate a particular area is the absence of conflict. The simple fact that the state has made certain regulations does not prohibit local government from establishing additional requirements so long as there is no conflict between them.

---

[11] Defendant is such an "urban-county government." A parallel statute, Ky. Rev. Stat. § 82.082, has much the same effect with regard to cities.

*Lexington-Fayette County Food & Bev. Ass'n v. Lexington-Fayette Urban County Gov't*, 131 S.W.3d 745, 750 (Ky. 2004) (citations omitted). "In order to rise to the level of a comprehensive system or scheme, the General Assembly must establish a definite system that explicitly directs the actions of a city." *Dannheiser v. City of Henderson*, 4 S.W.3d 542, 548 (Ky. 1999) (*citing Whitehead v. Estate of Bravard*, 719 S.W.2d 720 (Ky. 1986)).

### A.    Regulation of Veterinary Medicine

Plaintiffs argue that Chapter 321 of the Kentucky Revised Statutes regulates veterinarians so comprehensively that Ky. Rev. Stat. § 82.082 bars municipalities from imposing additional regulations on the profession. Specifically, they object to the reporting and notification requirements imposed by the ordinance's sections 91.025(B) (vaccination reporting), 91.075 (bite reporting), and 91.020(F) (veterinarians must notify clients of licensing and permit requirements).

Given the authorities quoted above on the meaning of preemption in Kentucky, the Court finds that none of these provisions are in such conflict with Chapter 321 as to be prohibited. The state-level regulation of veterinarians covers licenses, permits, certifications, the Board of Veterinary Examiners, and so forth. Its stated purpose is to "protect the public from being misled by incompetent, unscrupulous, and unauthorized practitioners, and from unprofessional or illegal practices by persons licensed to practice veterinary medicine." Ky. Rev. Stat § 321.175. The statute does not go into specifics of veterinary practice. Neither do the sections of the Kentucky Administrative Regulations covering the Board of Veterinary Examiners. *See* 201 Ky. Admin. Regs. §§ 16:010 *et seq.* The parties do not cite, and Court has not found, any state-level statute or

regulation dictating what veterinarians are or are not to report to the government or discuss with their clients.[12]

Furthermore, the ordinance does not regulate the practice of veterinary medicine in any serious way. The requirements it imposes are related to public health, safety, and awareness of the legal requirements for pet ownership.[13] They are not in conflict with the regulatory regime established by state law. That regime does not "direct the actions of the city" as regards veterinarians, and it does not prevent enactment of the public health and welfare regulations at issue here.

## B.     Cruelty to Animals

Next, plaintiffs assert that the ordinance's regulation of cruelty to animals runs afoul of the preemption statute, because (in their view) Kentucky has already regulated animal cruelty by statute. *See* Ky. Rev. Stat. §§ 525.125, 525.130, 525.135. However, as the Kentucky Supreme Court has interpreted Ky. Rev. Stat. § 67A.070(2), the Court sees no problem with Metro's ordinance. Plaintiffs point us to no specific conflicts, and the cruelty statutes do not "establish a definite system that explicitly directs the actions of a city." *Dannheiser*, 4 S.W.3d at 548. Accordingly, plaintiffs' challenge to the cruelty sections of the ordinance fail.

## C.     Nuisance

Finally, plaintiffs claim that the definition of nuisance in § 91.001 of the ordinance violates Kentucky law. The Kentucky statutes permit a municipality to enact a nuisance code so long as it

---

[12] Plaintiffs also claim that the state has occupied the field of "animal bite reporting," thereby preempting § 91.075. But the fact that the state requires some professionals to report a dog bite to local health authorities surely does not prevent a municipality from seeking that information from other sources.

[13] Plaintiffs contend that the vaccination reporting requirement pertains not to health and safety but to tax collection. Even supposing this to be true, collection of fees is surely a legitimate government purpose. Most importantly, the ordinance's reporting requirement is not in conflict with state law, regardless of its ultimate purpose.

(*inter alia*) "(1) Establish[es] the acts, actions, behavior, or conditions which constitute violations," and "(2) Establuish[es] reasonable standards and procedures for enforcement of the nuisance code." Ky. Rev. Stat. §§ 82.705, 82.710. Plaintiffs complain that the nuisance provisions of the ordinance fail to meet these requirements and are therefore illegal. However, as discussed in section I.B.3, *supra*, the ordinance's definition of "nuisance" is perfectly comprehensible, laying out the acts in question by means of a series of examples that serve to guide interpretation of the definition's more general language. Nothing in this definition violates the guidelines set down by the Kentucky abatement of nuisances statute.

*   *   *

A separate order in conformity with this opinion will be entered this date.